IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| DAVID FREVERT, | ) |
|         Plaintiff, | ) |
| vs. | ) Case No. 08-0385-CV-W-ODS |
| FORD MOTOR COMPANY, | ) |
|         Defendant. | ) |

ORDER AND OPINION GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pending is Defendant's Motion for Summary Judgment. For the following reasons, the motion (Doc. # 31) is granted.

I.  BACKGROUND

Many facts have been agreed to by the parties, so citations to the Record will be provided only when necessary. When viewed in the light most favorable to Plaintiff, the Record reveals the following uncontroverted facts.

Defendant hired Plaintiff in February 2003 as a material control supervisor. Six months later Plaintiff became a rail dock supervisor. Throughout his employment Plaintiff has worked at Defendant's plant in Claycomo, Missouri, and at the times relevant to this suit, Plaintiff was a salaried manager in Material Planning and Logistics ("MP&L").

Defendant maintained a toll-free "hotline" as one of several options for employees to use if they "bec[a]me aware of a known or suspected violation of Company Policy or business-related legal requirements . . . ." Reports to the hotline could be anonymous, and Defendant's policies prohibited "retaliation against individuals who in good faith, report suspected violations of the law or Company Policy, or who cooperate in an investigation of a suspected violation reported by someone else." Calls

to the hotline are answered by Personnel Relations Representatives in Dearborn, Michigan.

On August 27, 2007, Plaintiff made an anonymous call to the hotline and gave "a detailed description of the events and employees who had engaged in activities that the Plaintiff believed were in violation of Company policy." Complaint, ¶ 7. He provided the fake name of "Don" to preserve his anonymity. A contemporaneous e-mail sent from the Personnel Relations Representative receiving the call (Gina Allmon) and directing that the complaint be investigated similarly summarized the substance of Plaintiff's call. The report involved L.H. and alleged she came to work drunk, leaves early, takes long lunches, intimidates employees, gives other employees preferential treatment, retaliated against employees who "crossed" her, and was involved in a sexual relationship with another manager. In his Interrogatory answers dated November 19, 2008, Plaintiff summarized the call thusly:

> I identified myself as "Don" and then proceeded to provide a detailed description of the events and employees who had engaged in activities that I believe were in violation of company policy. . . . I described [L.H.'s] extremely inappropriate language and conduct that I believe created a hostile working environment. . . . I described instances where she would return to work from lunch when it was clear that she had been drinking.

Defendant followed its normal procedure: it transmitted the information to the Plant for an investigation by the Plant Human Resources Department, which was to report its findings back to Personnel Relations in Dearborn. The investigation was conducted by Lori Strohl. In accordance with Defendant's policies, Strohl was not told who made the call – indeed, there is no evidence that anyone in Dearborn knew who made the call. Strohl spoke with L.H.'s supervisor and learned L.H. had permission to work a flexible schedule. L.H.'s supervisor also denied observing L.H. arriving to work drunk or engaging in bullying or other appropriate behavior. The purported "sex scandal" involved a manager who no longer worked for Defendant, and there was no

2

evidence suggesting L.H. had abused her authority. Strohl reported her findings to Dearborn.[1]

In September 2007, Plaintiff called the hotline again and reported that two employees – A.H. and M.J. – were paid for time they did not work. He also provided more detail about L.H.'s sexually inappropriate comments and actions. While maintaining his fake persona, Plaintiff provided a list of witnesses who could provide information about L.H.'s actions and included his real name on that list. Plaintiff was advised to contact Nicole Berri, the Personnel Relations Representative in Dearborn who was responsible for all assembly plants in the United States. Plaintiff contacted Berri in early October and – still identifying himself as "Don" – again identified "David Frevert" among those who could provide information about L.H.'s actions. The list of "witnesses" was forwarded to Strohl, who interviewed all of them. Strohl instructed the people she interviewed not to reveal the topics or information discussed; divulging the contents of such interviews is a violation of Defendant's policies.

During his interview with Strohl, Plaintiff reported all of the incidents he described during the hotline calls. Plaintiff appeared to have information about a lot of incidents and events that he should not have had, so Strohl asked him if he was "the spokesperson for MP&L;" Plaintiff responded affirmatively, explaining that he was "more boisterous." Strohl Dep. at 99-100; Defendant's Exhibit 20 (recorded notes of Strohl's interview of Plaintiff).

Strohl was able to confirm some, but not all, of L.H.'s inappropriate comments and actions. On October 23, 2007, Strohl prepared a Proposal for Disciplinary Action, recommending that L.H. be "terminated in the best interest of the company." The proposal was forwarded to Dearborn. The investigation into A.H and M.J. revealed no pay practice irregularities.[2]

---

[1] Plaintiff did not report to L.H., nor did he work near her or on the same shift. In fact, Plaintiff did not personally witness any of the incidents he reported to the hotline; he merely relayed accounts provided by other employees.

[2] Plaintiff did not work with A.H. or M.J. and did not review their records before making the hotline call. He was merely reporting something somebody else told him.

Strohl's admonition against discussing the topic of the interviews with other employees was not followed. E.g., Plaintiff's Dep. at 102. Rumors and discussions about the topics of the investigation got back to L.H., who complained to Strohl and presented her with e-mails substantiating the investigation's details were a topic of discussion among the employees. L.H. also provided other e-mails exemplifying questionable language. Strohl Dep. at 31-33.[3] Based on the e-mails and the written notes of Strohl's interviews, Berri decided to follow-up personally. Berri Dep. at 19. She was motivated by both a concern about the content and tone of the e-mails as well as a concern that the policy requiring secrecy had been violated. Berri Dep. at 21-22, 43-45. She requested that e-mails of four individuals be pulled – Plaintiff, M.H., L.R., and D.R. – and chose these individuals based on the content of e-mails provided and the amount of information they provided to Strohl about L.H. (because that would indicate a possible source or contributor to the public discussion about the private interviews). Berri Dep. at 46. Due to the volume of e-mails involved, Berri traveled to the Claycomo plant to review the matter.

Berri and Paul Boesel – the Claycomo Plant's Salaried Personnel Supervisor – met with Plaintiff on November 6, 2007. The review of his e-mails revealed other activity that caused concern. Notably,

1. Plaintiff forwarded e-mails to his personal account containing proprietary business documents and photographs.
2. Plaintiff also forwarded proprietary business documents and photographs to L.R.
3. Plaintiff sent e-mails to his wife that violate Defendant's policies prohibiting sexual content.
4. Plaintiff altered an e-mail sent by another supervisor, Mark Cecchini. The alterations included the insertion of profanity.

---

[3]This may have been an attempt to demonstrate her conduct was no worse than anyone else's or an effort exact revenge on those L.H. perceived as responsible for her predicament.

4

Case 4:08-cv-00385-ODS    Document 40    Filed 06/01/09    Page 4 of 9

>    Plaintiff then forwarded the e-mail to another person with an invitation to "share it with anybody."
> 5. Plaintiff sent e-mails to other employees that included inappropriate langauge

Plaintiff did not provide a business reason for forwarding the company's information to his home computer. With respect to Cecchini's altered e-mail, Berri initially believed the entire message had been prepared by Cecchini – only subsequent investigation revealed Plaintiff as the true source of the alterations. Berri told Plaintiff she regarded these actions as violations of Defendant's policies, including those regarding computer and e-mail use and the secrecy of company information. Berri also told Plaintiff he could be disciplined, up to and including termination.

Until the incidents in question, Plaintiff had excellent (or better) ratings on his performance reviews and had received a monetary award for good performance in May 2007. He had never been disciplined for any misconduct, although he had been "coached" for violating Defendant's computer usage policies in September 2005.

The decision to terminate a salaried employee is made at the national headquarters in Dearborn.[4] After her interviews were completed, Berri recommended Plaintiff and L.R. be terminated and that D.R. and M.H. be suspended. Berri also approved Strohl's recommendation that L.H. be terminated. These decisions were further endorsed by Berri's superiors, and Plaintiff was terminated on December 3, 2007.[5] He was told he was being terminated because of the contents of his e-mails, as

---

[4] Plaintiff attempts to controvert this fact by relying on a passage from Defendant's Directive B-109. This document addresses "Appropriate Use of Company Computer Resources and Similar Company Assets" and indicates that local plaints have the final determination as to what constitutes appropriate use of company computer resources for personal matters. It does not address Defendant's policies regarding proprietary information, sexual harassment, alteration of e-mails, and the like. It also does not address who makes discipline decisions for salaried personnel, so it does not refute the point. In any event, Plaintiff concedes that nobody at the Claycomo plant participated in the decision to terminate him.

[5] L.H.'s termination was effective in early January 2008 because she was on medical leave when the final decision to terminate her was made.

5

described earlier, and that those e-mails constituted inappropriate use of company computers and behavior unbecoming of a member of management. Plaintiff's Dep. at 147-48; Plaintiff's Exhibit 14. Nobody told Plaintiff he was terminated for making the hotline call or otherwise participating in the investigation into L.H.'s conduct.

Plaintiff filed this suit in April 2008, alleging he was wrongfully fired for making the hotline call. The case was removed to federal court in May 2008.

## II. DISCUSSION

A moving party is entitled to summary judgment on a claim only if there is a showing that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See generally Williams v. City of St. Louis, 783 F.2d 114, 115 (8th Cir. 1986). "[W]hile the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Get Away Club, Inc. v. Coleman, 969 F.2d 664 (8th Cir. 1992). In applying this standard, the Court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588-89 (1986); Tyler v. Harper, 744 F.2d 653, 655 (8th Cir. 1984), cert. denied, 470 U.S. 1057 (1985). However, a party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of the . . . pleadings, but . . . by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

Plaintiff was an at-will employee. Under Missouri law, an at-will employee can be terminated at any time without cause. "However, Missouri recognizes a public policy exception to the at-will rule. Generally, the exception has been applied in cases involving employ[ees] fired for: (a) declining to violate a statute; (b) reporting violations of the law by employers or fellow employees; or (c) asserting a legal right." Callantine v. Staff Builders, Inc., 271 F.3d 1124, 1130 (8th Cir. 2001). With respect to the second

6

category, the alleged violation reported must be a violation of law – a reported violation of company policy does not give rise to the public interest necessary to overcome the at-will doctrine. E.g., Sivigliano v. Harrah's N. Kansas City Corp., 188 S.W.3d 46, 49 (Mo. Ct. App. 2006). Moreover, the employee must establish that the exclusive cause of his termination was the report of violations. E.g., Grimes v. City of Tarkio, 246 S.W.3d 533, 536 (Mo. Ct. App. 2008); Lynch v. Blanke Baer & Bowey Krimko, Inc., 901 S.W.2d 147, 150-51 (Mo. Ct. App. 1995).[6] The Court concludes the uncontroverted evidence demonstrates (1) he did not report illegal conduct to his superiors and (2) the fact that he called the hotline was not a part, much less the exclusive cause, of the decision to terminate his employment.

## A. Reporting Criminal Conduct

Defendant argues, and Plaintiff does not deny, that the accusations against L.H. involved violations of company policy that would not give rise to any protection. Plaintiff insists, however, that his report about A.H. and M.J. constituted a report of theft, which is a crime. There are several problems with this position.

First, there are undeniably instances in which violation of an employer's policies can also constitute a crime. A report of the former, however, is not automatically and necessarily a report of the latter. Indeed, Plaintiff himself never described his hotline call as one reporting a crime – at least, not until after Defendant filed its Motion for Summary Judgment and argued that reported violations of company policy do not provide whistleblower status. Faced with this argument, Plaintiff prepared an Affidavit that – for the first time – declared that he "believed that these two employees were

---

[6]At one time, the Western Division of the Missouri Court of Appeals suggested – but did not decide – that the exclusivity requirement only exists with respect to employees fired for asserting worker compensation claims. Brenneke v. Veterans of Foreign Wars, 984 S.W.2d 134, 139-140 (Mo. Ct. App. 1998). Since then, the Western Division has joined the other Divisions of that court, as evidenced by subsequent decisions such as Grimes and Faust v. Ryder Commercial Leasing & Services, 954 S.W.2d 383, 391 (Mo. Ct. App. 1997).

7

stealing from Ford Motor Company and that these were criminal acts in violation of the criminal laws of the State of Missouri." Plaintiff's Affidavit, ¶ 8. Until that time, Plaintiff had consistently – in his Complaint, Interrogatory Answers, and deposition – described his report as one revealing violations of company policy. Plaintiff cannot use an eleventh-hour affidavit to contradict his prior characterizations of his actions and thoughts. E.g., Bacon v. Hennepin County Med. Ctr., 550 F.3d 711, 716 (8th Cir. 2008); Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361, 1364-66 (8th Cir. 1983).

The whistleblower protection reflects the public policy encouraging the uncovering and prosecution of crime. Brenneke, 984 S.W.2d at 138-39.[7] There is no public policy encouraging the uncovering and disciplining violations of company policy. In this case, the uncontroverted evidence demonstrates Plaintiff reported violations of company policy. While those violations may have been violations of law, this was not the nature or content of Plaintiff's report. Therefore, he is not entitled to whistleblower protection.

## B. Causal Connection

The more significant obstacle to Plaintiff's claim is the element requiring an exclusive causal connection between his hotline call and his termination. Plaintiff argues the reasons proffered for his discharge are implausible; this fact, combined with the temporal proximity between his report and his termination, would provide a baiss for the jury to find the necessary nexus. The Court disagrees with Plaintiff's analysis.

First, Plaintiff does not deny that he violated Defendant's policies. He downplays the significance of those violations, and in some instances tries to justify them. He contends the jury might find Defendant's reasons for his termination to be contrivances

---

[7]An argument can also be made that the "crime" in question was not "sufficiently serious" to give rise to protection. To be sure, Brenneke is distinguishable because there the crime was not simply theft; the Missouri Court of Appeals found "that it is a strong mandate of Missouri public policy to prevent theft of charitable donations to and funds of a non-profit organization such as the VFW." 984 S.W.2d at 139. In light of the Court's decisions on other issues, there is no need to address this one.

8

that mask the true reason. However, courts are not "super-personnel departments" empowered to examine the wisdom or propriety of an employer's decision. E.g., McNary v. Schreiber Foods, Inc., 535 F.3d 765, 770 (8th Cir. 2008). Similarly, juries are not allowed to return a plaintiff's verdict simply because they disagree with an employer's decision. Yet, this is what Plaintiff asks the Court to allow: provide the jury with a chance to decide for itself whether Plaintiff should have been fired and, if it does not believe so, to decide the true reason for the termination was his hotline call. This invitation to speculate is not permissible.

Plaintiff also points to the closeness in time between his report and his termination. While this is some evidence, by itself it is insufficient. E.g., Smith v. Allen Health Sys., Inc., 302 F.3d 827, 832 (8th Cir. 2002) (addressing retaliation claim under the Family Medical Leave Act). More importantly, the closeness in time can be a relevant indicator of Defendant's intent only if the decisionmakers knew about both events. This leads to the largest barrier to Plaintiff's claim – the absence of any indication Defendant knew Plaintiff made the hotline call. The Record demonstrates the people who decided to terminate Plaintiff's employment did not know he made the hotline call – so the closeness in time is irrelevant. More importantly, this lack of knowledge demonstrates, conclusively, that the fact he made the hotline call could not have been a part – much less the exclusive cause – of his termination.

### III. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted.
IT IS SO ORDERED.

                                            /s/ Ortrie D. Smith
                                            ORTRIE D. SMITH, JUDGE
DATE: June 1, 2009                   UNITED STATES DISTRICT COURT

9

Case 4:08-cv-00385-ODS   Document 40   Filed 06/01/09   Page 9 of 9